Cite as 2023 Ark. App. 455

# ARKANSAS COURT OF APPEALS
DIVISION IV
No. CV-20-692

| | |
|---|---|
| EL DORADO AMMONIA, LLC, AND EL DORADO CHEMICAL COMPANY<br>APPELLANTS/CROSS-APPELLEES<br><br>V.<br><br>GLOBAL INDUSTRIAL, INC.<br>APPELLEE/CROSS-APPELLANT | Opinion Delivered October 18, 2023<br><br>APPEAL FROM THE UNION COUNTY CIRCUIT COURT<br>[NO. 70CV-16-76]<br><br>HONORABLE DAVID F. GUTHRIE, JUDGE<br><br>REVERSED AND REMANDED |

**RITA W. GRUBER, Judge**

El Dorado Ammonia, LLC, and El Dorado Chemical Company filed an interlocutory appeal of the April 23, 2020 "Amended Judgment I" of the Union County Circuit Court, and Global Industrial, Inc., cross-appeals. The parties raise multiple points on appeal, but only two of those points are dispositive: (1) whether the materialmen's lien filed by Global was perfected; and (2) whether the circuit court's reference to damages for "unpaid invoices" is a judgment that is collectible through remedies other than the materialmen's lien. We reverse and remand.

I. *Factual and Procedural Background*

A. Project History

In its simplest terms, this is a case about a subcontractor attempting to get paid for work it performed during the construction of an ammonia plant.

El Dorado Chemical Company ("EDCC") owns a chemical plant in Union County, Arkansas, that suffered an explosion in 2012. EDCC's parent company created El Dorado Ammonia ("EDA") to own and operate an ammonia facility that would be constructed at the plant after the explosion. For purposes of this opinion, EDCC and EDA have the same interests and make the same arguments, so they will be referred to collectively as "El Dorado Chemical." Although the parent company was originally a party to this lawsuit, it was dismissed voluntarily in 2018.

In 2013, EDA engaged Leidos Constructors, LLC ("Leidos"), to be the general contractor on a project during which an ammonia plant in Louisiana would be dismantled, and the salvage from that plant would be used in constructing the ammonia facility in Union County (the "Project"). Leidos hired Global Industrial, Inc. ("Global"), to be a subcontractor for the Project. Through three subcontracts, Leidos engaged Global in 2014 to perform both salvage and reconstruction work during the Project. Global agreed to perform its work on a time-and-materials basis. Through an additional subcontract, Leidos also engaged Global to perform repair work on other parts of the chemical plant after the explosion. Global agreed to perform this work in exchange for a lump sum. There was no contract between Global and EDA or EDCC for any work that Global performed.

On July 1, 2015, Leidos issued a written notice of termination to Global. At the time of termination, Global had already submitted invoices totaling $9,068,754.43. After

termination, Global submitted additional invoices, and the total of all unpaid invoices was $12,426,140.68. Also after the termination, Leidos and El Dorado Chemical hired replacement subcontractors to cure nonconforming work and to complete the Project. In November 2015, Leidos issued a $9,977,357 back charge against Global's outstanding invoices. Of this amount, $4,914,850 represented costs to cure Global's alleged nonconforming work, and the remaining $5,062,507 was for "inefficiency and project impact costs."

## B. Materialmen's Lien History

On September 29, 2015, Global recorded a materialmen's lien in the amount of $12,426,140.68. The lien stated:

> The real property which is charged with this lien is a portion of the property described on Exhibit A attached hereto and incorporated herein by this reference. Such property is commonly known as the El Dorado Chemical Plant, and such plant is located at the following address: 4500 N. West Avenue, El Dorado, AR 71730.

Exhibit A was a property description for the entirety of the property owned by EDCC at that address, which includes hundreds of acres and many buildings. Global also included as exhibits two overhead shots from Google Images showing the property and claimed exhibit B-2 "is a more detailed/closer aerial photograph depicting the general location in which the labor was furnished and materials provided." Exhibit B-2 is an aerial photograph that includes many structures and buildings with text added that says, "Plant area where Global Industrial, Inc. provided labor and materials."

After the original materialmen's lien was filed, Leidos paid Global for the difference between the amount invoiced and the amount of the back charge. Global then amended its materialmen's lien on February 23, 2016. The first amended lien was in the amount of $8,772,815.69. The amended lien did not describe the property on which work was performed with any further specificity. On February 26, 2016, Global filed a lis pendens that covered all property owned by EDCC in Union County. More than a year later, on May 30, 2017, Global filed its second amended materialmen's lien that included a metes and bounds description of precisely where on EDCC's property Global had performed work. On November 14, 2018, during trial, Global filed an amended lis pendens to include only the property identified in the second amended materialmen's lien and released the remaining previously identified portion of EDCC's property from the lien claim.

## C. Procedural History

Global filed its complaint against Leidos, EDA, EDCC, and other defendants on February 26, 2016, alleging breach of contract, foreclosure, and negligence. On December 28, 2017, Global filed its second amended complaint against Leidos, EDA, EDCC, and others. This is the operative complaint in the lawsuit. On January 12, 2018, Leidos filed a counterclaim against Global for breach of contract. At various points during the litigation, other parties filed claims, counterclaims, cross-claims, and third-party claims.

On September 24, 2018, the circuit court entered an order bifurcating all cross-claims, Leidos's counter cross-claims against EDA and EDCC, Leidos's counter cross-claims against EDCC's parent company, and the third-party claims. In other words, all claims by

and directly against Global were to be tried in "Phase I," while all other matters would be heard in "Phase II." In its bifurcation order, the circuit court also stated that the parties were "free to assert at trial any and all defenses that relate to the claims by Global and the counterclaim by Leidos against Global."

Phase I was a four-week bench trial from October 22 through November 14, 2018, during which Global's five surviving causes of action were litigated: (1) breach of contract against Leidos; (2) breach of contract against EDA; (3) lien foreclosure against Leidos; (4) lien foreclosure against EDCC; and (5) lien foreclosure against EDA, as well as the counterclaims asserted by Leidos against Global. During trial, Global presented evidence of unpaid invoices totaling $9,068,754.43. Leidos presented evidence of $10,080,849 in charge backs. At the end of trial, Global moved to conform the pleadings to the evidence, which added claims for intentional interference with a contract against EDA and EDCC.

On March 12, 2020, the circuit court entered Judgment I, disposing of all claims and counterclaims tried in Phase I. In that order, the circuit court awarded judgment to Global against EDA "on its derivative action for debt on [certain subcontracts] for the sum of $3,028,082" and another judgment to Global against EDCC "on its derivative action for debt on [a certain subcontract] for the sum of $4,356,781." Judgment I then foreclosed on Global's lien in the amount of $7,384,863 and denied relief on all other claims against all other parties.

El Dorado Chemical filed a motion for reconsideration under Arkansas Rule of Civil Procedure 59. Global filed a motion to amend the judgment to include attorneys' fees and a judgment against Leidos.

On April 23, 2020, the circuit court entered Amended Judgment I. After changing some language from Judgment I, Global was awarded judgment against EDA "on its action for nonpayment of invoices on [certain subcontracts] for the sum of $3,028,082 . . ." and another judgment against EDCC "on its action for nonpayment of invoices on [a certain subcontract] for the sum of $4,356,781 . . ." in Amended Judgment I. The circuit court then went on to foreclose on Global's lien against EDA and EDCC "to satisfy the debt of $4,356,781 and $3,028,082 respectively[.]" The circuit court also awarded Global prejudgment interest on a portion of the judgment and postjudgment interest against the entirety of the judgment.

As to the other claims, the circuit court ruled that no defendant was liable for breach of contract, unjust enrichment, or tortious interference. Because each party was successful, in part, in litigation that spanned many years, the circuit court did not award attorneys' fees to any party. There is a detailed and sufficient Rule 54(b) certificate attached to Amended Judgment I. El Dorado Chemical and Global all filed timely notices of appeal.

## II. *Standard of Review*

We review lien-foreclosure cases de novo on appeal. *Fla. Oil Inv. Grp., LLC v. Goodwin & Goodwin, Inc.*, 2015 Ark. App. 209, at 5, 463 S.W.3d 323, 326.

## III. *The Materialmen's Lien*

6

A. Property Description in the Original and First Amended Materialmen's Liens

Materialmen's liens are governed by Arkansas Code Annotated sections 18-44-101 et seq. (Repl. 2015 & Supp. 2023). These code sections lay out a process with many steps and requirements. The determinative issue in this appeal is whether the property description in the lien was legally sufficient.

Arkansas Code Annotated section 18-44-117(a) (Supp. 2023) mandates that a person wishing to place a materialmen's lien on a piece of property must file a lien account within 120 days after the work was performed. The filing must include, among other information, "a correct description of the property to be charged with the lien, verified by affidavit." Ark. Code Ann. § 18-44-117(a)(2)(A). The statute is explicit that for real property, "a street address is not a correct description of the property under subdivision (a)(2)(A) of this section." *Id.* § 18-44-117(a)(2)(B).

The materialmen's-lien statute is strictly construed "because it is an extraordinary remedy not available to every merchant or worker." *Servewell Plumbing, LLC v. Summit Contractors, Inc.*, 362 Ark. 598, 606, 210 S.W.3d 101, 107 (2005) (citing *Christy v. Nabholz Supply Co., Inc.*, 261 Ark. 127, 546 S.W.2d 425 (1977)). Additionally, the statute is "in derogation of the common law and therefore [is] strictly construed, thus requiring strict compliance." *JMAC Farms, LLC v. G&C Generator, LLC*, 2017 Ark. App. 658, at 8, 537 S.W.3d 274, 278. If a subcontractor complies with the lien statutes, then it is entitled to "a lien upon the improvement and on up to one (1) acre of land upon which the improvement

is situated, or to the extent of any number of acres of land upon which work has been done or improvements erected or repaired." Ark. Code Ann. § 18-44-101(a) (Repl. 2015).

To determine whether a lien account has a suitably specific description of the property, the test is whether it "sufficiently described the improvements of the [improved property] as to afford information concerning the situation of the property to be charged with the lien and that it is sufficient to enable anyone familiar with the locality to identify the premises intended to be described with reasonable certainty, to the exclusion of others." *Ark. Foundry Co. v. Am. Portland Cement Co.*, 189 Ark. 779, 784, 75 S.W.2d 387, 390 (1934).

In this case, we must determine whether Global's property description was too broad to comply with the statute. We conclude that it was. While there are situations in which an overinclusive property description can pass the test and describe the location such that a person familiar with the locality could identify it with reasonable certainty, this is not such a situation.

In *Whitener v. Purifoy*, 177 Ark. 39, 40, 5 S.W.2d 724, 724 (1928), a contractor had furnished "one brick trowel . . . and six sheets iron roofing" for a house on a tract in Dallas County. The contractor stated in the affidavit and lien account that the materials had been provided for a house in "the southwest quarter of the northwest quarter section 3 township 8 south, range 15 west, and the southeast quarter of the northeast quarter section 4, township 8 south, range 15 west, in Dallas [C]ounty, Ark." *Id.* at 40, 5 S.W.2d at 724–25. That property description encompassed the entirety of the owner's eighty-acre farm and was employed in the original complaint. *Id.* at 40–41, 5 S.W.2d at 725. The contractor did

8

ultimately amend the property description within his complaint—not the affidavit or account—to the acre of land described by metes and bounds upon which the house was located. *Id.* at 40, 5 S.W.2d at 725. However, the court, in determining that the affidavit was sufficient, emphasized that there was only one dwelling on the land, and therefore, there could "be no uncertainty as to the house upon which the lien is claimed." *Id.* The court also noted that there was no ambiguity "before the complaint was so amended." *Id.* at 43, 5 S.W.2d at 726.

Contrast that case with *Arkmo Lumber Co. v. Cantrell*, 159 Ark. 445, 252 S.W. 901 (1923), which is more like the situation here. In *Arkmo*, a company provided $992.75 worth of lumber and materials to D.H. Scroggin, a tenant and alleged agent of J.H. McClung, to build improvements on a 1,380-acre tract in Jefferson County owned by McClung. *Id.* at 450–51, 252 S.W. at 902–03. In an attempt to be compensated for the lumber and materials, the company filed the duly verified account, with a description of the property upon which the lien was claimed, and then filed suit. *Id.* at 451, 252 S.W. at 902. The lien account described the real property as "the property of J.H. McClung, deceased, Bessie Cantrell, administratrix." *Id.* at 457, 252 S.W. at 905. The affidavit included with the lien account described the entire tract of land—some 1,380 acres—"but not the improvements." *Id.* at 457–58, 252 S.W. at 905. There, the owner contended that the company did not properly perfect its lien because it failed to describe the specific improvements for which the materials were used and the specific acre of ground upon which the improvements were situated. *Id.* at 458, 252 S.W. at 905. The supreme court, in concluding that the lien was not properly perfected,

9

explained that while no "particular form" was required with respect to the description, "the account or claim for a lien" was "too vague and indefinite, since it does not describe the particular land or the particular buildings upon which the lien is sought to be established." *Id.* at 459, 252 S.W. at 905–06. In other words, the fact that the lien account identified too much real property was not fatal—instead, the defect was the inability to identify the area of improvement with any certainty.

Similarly, the property description in Global's original lien and the first amended lien was insufficient. It included hundreds of acres. The aerial photograph included as exhibit B-2 does not identify precisely where the improvements were made. There are many buildings shown across many acres, but there is no indication by which even an individual familiar with the locality could identify which specific structures were improved by Global. Out of the hundreds of acres in the property description, Global performed work on buildings covering only 3.562 acres of the property. It is true that extrinsic evidence can be used to determine which segment of the property is subject to the lien. *See Arkhola Sand & Gravel Co. v. Hutchinson*, 291 Ark. 570, 573, 726 S.W.2d 674, 676 (1987). However, Global's own expert testified that he could not identify which portion of the property was encumbered on the basis of the original materialmen's lien and the first amended lien. The property description in the original lien and the first amended lien was not "sufficient to enable anyone familiar with the locality to identify the premises intended to be described with reasonable certainty, to the exclusion of others." *Ark. Foundry*, 189 Ark. at 784, 75 S.W.2d at 390.

Global argues that El Dorado Chemical would not allow Global's surveyor to enter the land, and therefore, Global could not have gotten a more specific description of its improvements before filing the lien account. This fact is not persuasive in this case. No case or statute requires a specific metes and bounds description of the improvements. Rather, only a description "sufficient to enable anyone familiar with the locality to identify the premises intended to be described with reasonable certainty, to the exclusion of others" is required. *Id.* In *Whitener*, it was determined that the property description within the affidavit was sufficient despite the fact that it encompassed the entirety of the owner's eighty-acre farm because it also stated that the materials had been provided for a house, and there was only one house located on the eighty acres. *Whitener, supra.* As such, the premises could be identified with reasonable certainty. We are not convinced that Global could not obtain a survey or use alternate means to specifically identify the encumbered property on its lien account. It did not, and neither its original materialmen's lien nor its first amended lien was perfected.

B. Timing of Second Amended Materialmen's Lien

Having concluded that the property description in the original materialmen's lien and the first amended lien was insufficient, we now must determine whether the second amended lien cured that insufficiency. There is no dispute that the property description in the second amended lien identified the area of improvement with certainty.

However, the lien account must be filed within 120 days after the performance of the work or provision of materials. Ark. Code Ann. § 18-44-117(a)(1). The original

11

materialmen's lien was timely filed. Moreover, all actions must be commenced within fifteen months after filing the lien account. Ark. Code Ann. § 18-44-119(a) (Repl. 2015). And, a lien expires after fifteen months unless "(1) An action shall be instituted as described in this subchapter; *and* (2) A lis pendens is filed under § 16-59-101 et seq." *Id.* § 18-44-119(b) (emphasis added).

As stated above, strict compliance with the statute is required "primarily for the protection of third parties who might acquire rights in, or liens upon, the property." *Wiggins v. Searcy Fed. Sav. & Loan Ass'n*, 253 Ark. 407, 410, 486 S.W.2d 900, 902 (1972). The statutory scheme is also designed to protect the landowner by ensuring that the owner has notice of any potential action and an opportunity to protect its property from the potential effects of a lien. *See id.*

In *Wiggins*, a contractor constructed a residence on a piece of real property. The contractor filed a complaint against the property owner within 120 days of completion of the work, claiming that he was entitled to a materialmen's lien on the property. *Id.* at 408–09, 486 S.W.2d at 902. A bank, which had not been included as a defendant, intervened to ensure that the contractor's lien did not get priority over the bank's mortgage on the property, and the ultimate issue in the case was which lien had priority. *Id.* While the contractor filed the complaint within 120 days of completion of the work, he did not file a lien account under the statute within 120 days of completion of the work. *Id.* In concluding that the bank had priority, the supreme court noted, "It is true that, *as between the landowner and the lien claimant*, the filing of a suit against all necessary parties to preserve and enforce

the lien within the 120-day period is a substantial compliance with the statute which cures the omission to file the account with the circuit court clerk." *Id.* at 409–10, 486 S.W.2d at 902 (emphasis added) (citing *Burks v. Sims*, 230 Ark. 170, 321 S.W.2d 767 (1959); *Rust v. Kelley Bros.' Lumber Co.*, 180 Ark. 517, 21 S.W.2d 973 (1929)). The supreme court further noted this was a "relaxation of the statutory requirement." *Wiggins*, 253 Ark. at 410, 486 S.W.2d at 902. However, that relaxation was justified because the notice of filing of the lawsuit within the 120 days gave the landowner "as much notice of the assertion of the lien and opportunity to protect his property from it as he would have by a strict compliance with the statute and that the filing requirements are intended primarily for the protection of third parties who might acquire rights in, or liens upon, the property." *Id.* (citing *Anderson v. Seamans*, 49 Ark. 475, 5 S.W. 799 (1887); *Pfeiffer Stone Co. v. Brogdon*, 125 Ark. 426, 188 S.W. 1187 (1916); *Rust, supra*). To meet this relaxed standard, the complaint must be filed within 120 days and must either include the loan account "or allegations of the complaint which embrace substantially all that the statute requires to appear in the verified account are treated as a substitute for the account required by the statute." *Id.* at 410, 486 S.W.2d at 902–03.

In this case, Global filed its defective original materialmen's lien on September 29, 2015. It filed the defective first amended lien on February 23, 2016. The lis pendens was filed three days later, on February 26, 2016. The lis pendens gave notice that there was an action to foreclose on the property described in the defective original materialmen's lien and the defective first amended lien. In other words, the original lien, the first amended lien,

13

and the lis pendens were not compliant with the statute because the property description was insufficient. The action to foreclose on the lien was instituted on February 26, 2016, much more than 120 days after the work was completed, so the relaxed standard articulated in *Wiggins* does not apply.

Although it is not exactly the same situation, *Servewell Plumbing* is instructive. In *Servewell Plumbing*, a subcontractor performed work for a general contractor. 362 Ark. at 601, 210 S.W.3d at 104. The subcontractor filed its original complaint within 120 days of completing the work, making claims for breach of contract and unjust enrichment and alleging that it had a lien, but the lien was not yet perfected. *Id.* at 605, 210 S.W.3d at 107. Two months later, the subcontractor filed an amended complaint seeking enforcement of the lien. *Id.* However, the subcontractor's lien account was filed 124 days after the work had been completed, missing the statutory 120-day cutoff. *Id.* at 605–06, 210 S.W.3d at 107. Because the lien was filed outside the 120-day deadline, it was not perfected at the time the amended complaint was filed. *Id.* at 606, 210 S.W.3d at 107. There is a similar failing in this case.

Global filed the second amended lien on May 30, 2017, which is the document containing the updated and sufficient legal description. This was twenty months after the original materialmen's lien was filed. Global did not file the amended lis pendens until November 14, 2018, during trial. This amended lis pendens gave notice that there was an action to foreclose on the property that had been properly described in the second amended

lien. However, the amended lis pendens was filed thirty-seven months after the original materialmen's lien, which is long after the fifteen months prescribed by statute.

Because Global filed the complaint outside the 120-day window, strict compliance with the materialmen's-lien statute is required. The original materialmen's lien would expire unless a lawsuit and a lis pendens properly identifying the property was filed within fifteen months. Global did not meet either of those requirements. The second amended complaint, which incorporated the proper description in the second amended lien, was filed twenty-six months after the original materialmen's lien—far more than 120 days after the work had been performed. The amended lis pendens was filed thirty-seven months after the original materialmen's lien. The time period to enforce the lien had long passed by that point.

For these reasons, this court reverses the circuit court's order to foreclose on Global's lien in Amended Judgment I.

IV. *Reference to Nonpayment of Invoices*

In Judgment I, the circuit court awarded judgment to Global against EDA "on its derivative action for debt on [certain subcontracts]" and another judgment to Global against EDCC "on its derivative action for debt on [a certain subcontract]." This language was changed in Amended Judgment I, which states that Global was awarded judgment against EDA "on its action for nonpayment of invoices on [certain subcontracts] for the sum of $3,028,082" and another judgment against EDCC "on its action for nonpayment of invoices on [a certain subcontract] for the sum of $4,356,781." The circuit court then went on to

15

foreclose on Global's lien against EDA and EDCC "to satisfy the debt of $4,356,781 and $3,028,082 respectively[.]"

El Dorado Chemical argues that this judgment is improper and classifies this finding as "a fictitious cause of action" and further states that Global never brought an action against EDA or EDCC for "nonpayment of invoices."

One reason Global filed the lawsuit in the first place was to foreclose on a materialmen's lien against El Dorado Chemical. To determine whether Global was entitled to foreclose on the lien, "[t]he court shall ascertain by a fair trial, in the usual way, the amount of the indebtedness for which the lien is prosecuted and may render judgment therefor . . . ." Ark. Code Ann. § 18-44-127(a) (Repl. 2015). We interpret Amended Judgment I as simply stating how the circuit court came to ascertain "the amount of indebtedness." Determining the value of the "unpaid invoices" seems to have been the circuit court's way of quantifying the indebtedness. In support of this interpretation, the circuit court goes on to state a few sentences later that foreclosure of the lien was granted to satisfy EDA's and EDCC's debt to Global. Additionally, the circuit court denied all of Global's other causes of action that could have given rise to an additional judgment. As such, this court believes the circuit court's language concerning "nonpayment of invoices" was not an attempt to establish a further cause of action.

To the extent that the language could be interpreted as a judgment for "nonpayment of invoices," such judgment is reversed and remanded. Nonpayment of invoices is not an independent cause of action. The courts have recognized some flexibility in recognizing a

new cause of action "to adjust to meet society's changing needs." *See Dowty v. Riggs*, 2010 Ark. 465, at 6, 385 S.W.3d 117, 120. However, because there are "boundless claims in an already crowded judicial system," we "will decline to recognize a new cause of action if there are other sufficient avenues . . . that serve to remedy the situation for a plaintiff." *Id.* Interpreting "nonpayment of invoices" as a separate cause of action would be to recognize a newly invented claim when many already exist in Arkansas law to address the situation at hand, for example, breach of contract, foreclosure on a materialmen's lien, unjust enrichment, or tortious interference with contract.[1]

Because this court reverses the circuit court's foreclosure of the materialmen's lien and any judgment for "unpaid invoices," all additional issues raised by the parties are moot.

Reversed and remanded.

GLADWIN and MURPHY, JJ., agree.

*Greenberg Traurig LLP*, by: *James R. Leahy, Mary-Olga Lovett*, and *Stephen Edmundson*; and *Quattlebaum, Grooms & Tull PLLC*, by: *Joseph R. Falasco*, for appellants/cross-appellees.

*Logan & Lowry, LLP*, by: *David E. Jones*; and *Stone & Sawyer, PLLC*, by: *R. Jeffrey Sawyer*, for appellee/cross-appellant.

---

[1]Global did not appeal the adverse rulings on breach of contract, unjust enrichment, or tortious interference.